**SO ORDERED.**

**SIGNED July 24, 2026.**



_____
**JOHN W. KOLWE**
**UNITED STATES BANKRUPTCY JUDGE**

---

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

In re:

Southern Pointe Land, LLC,
*Debtor*

Case No. 26-20306

Chapter 11

Judge John W. Kolwe

### Ruling on Motion for Turnover and Motion to Excuse Receiver from Compliance with Section 543

Before the Court are a Motion for Turnover of Property by Receiver filed by the Debtor, Southern Pointe Land, LLC (ECF # 16) and a Motion Under Section 543(d) of the Bankruptcy Code to Excuse Receiver from Compliance with Section 543 filed by Vanderbilt Mortgage and Finance, Inc. ("Vanderbilt") (ECF # 19). The Court took these matters under advisement following an evidentiary hearing on July 8, 2026. The Court has considered the arguments of the parties and the evidence adduced during the hearing, and for the reasons set forth in this opinion, the Court will grant

1

the Debtor's Motion for Turnover and deny Vanderbilt's Motion seeking to excuse the Receiver from compliance with § 543 of the Code.[1]

## Factual Background

The facts established during the evidentiary hearing on these matters are summarized as follows.

### 1. The Debtor, Its Property and Related Entities, and a Description of Its Business

The Debtor owns real estate in Lake Charles, Louisiana that it is developing into a mobile home community known as Southern Pointe (the "Community"). The Community will consist of 344 manufactured home lots when complete. The Debtor's development plan is broken into three phases, with two of the three phases now completed, and the Debtor is nearing completion of phase three. Although not entirely clear from the record of this matter, it appears that 181 of the total 344 lots are currently in commerce.

The Debtor's plan for the Community also includes the acquisition of new manufactured homes to be placed on each of the 344 lots, but under the development plan, the Debtor does not own these homes. Instead, a separate entity related to the Debtor, Southern Pointe Homes, LLC, will own the homes. Finally, management of the Community was vested with another Debtor-related entity, Southern Choice Properties, LLC. Thus, the primary purpose of the Debtor and Southern Pointe Homes is to own land and manufactured homes, respectively, and it is the responsibility of Southern Choice Properties to handle the actual management of the properties, including leasing, collection of rents, and the maintenance of the Community.

The development plan also provides for Southern Pointe Homes to acquire all homes for the Community from Clayton Homes, which is an entity with ties to Vanderbilt, but supply chain issues prevented Clayton from providing all the homes;

---

[1] The Court rendered its opinion on the record on July 14, 2026. This written opinion is essentially the same as that entered on the record, with minor edits.

Clayton was only able to provide 24 homes. Thus, Southern Pointe Homes only owns 24 of the homes located in the Community, and the Court will refer to these homes as the "Clayton Homes."

The Debtor indicates that another supplier of manufactured homes, Legacy Homes, supplied all the other homes for the Community (the "Legacy Homes"). The Legacy Homes are not owned by the Debtor; nor are they owned by Southern Pointe Homes. The record of this matter does not clearly identify the owners of the Legacy Homes, although it appears that another entity related to the Debtor through common ownership likely owns those homes.

When moving into the Southern Pointe mobile home community, each tenant enters into two leases: one for the lot, with rent payable to the Debtor; and one for the manufactured home on the lot, with rent payable to Southern Point Homes for the Clayton Homes, and presumably to an unidentified third party for the Legacy Homes. The monthly lot rent charged to each tenant by the Debtor is $450. The manufactured homes are separately leased by the owner of those homes for $500 per month. Finally, the tenants are charged a monthly fee to cover maintenance of the Community, including the common areas, and for providing water and sewer. Although multiple entities are entitled to payment from the tenants, the tenants would generally write only one check or money order payable to the company charged with managing the Community, Southern Choice Properties.

### 2. The Debtor's and Southern Pointe Homes' financing arrangements

In August 2018, the Debtor granted a mortgage over the real estate comprising the Community to Vanderbilt to secure a promissory note executed by the Debtor in favor of Vanderbilt in an original principal amount not to exceed $8,972,349.00. The stated purpose of this loan was for the acquisition of the property that would be used to develop the 344 home sites.

Also in August 2018, Southern Pointe Homes entered into a security agreement with Vanderbilt related to the acquisition of manufactured homes to be placed on the Debtor's lots, and those homes and related rents were to secure a

promissory note given in favor of Vanderbilt by Southern Pointe Homes in an amount not to exceed $14,706,000.00. Vanderbilt's loan to Southern Pointe Homes was for the stated purpose of allowing Southern Pointe Homes to acquire homes for all the lots in the Community. As previously noted, Clayton Homes was to provide all the homes but ultimately was only able to provide the 24 Clayton Homes. Based on representation made by Vanderbilt's counsel during the hearing, it is undisputed that Vanderbilt's security interest under the Southern Pointe Home loan agreement is limited to these 24 homes.

The owner of the Legacy Homes also granted a security interest in those homes to third party lenders, but the identity of those lenders is not disclosed in the record.

The Debtor's representative testified that the lender on the Legacy Homes has provided a three-year extension on its loans. However, the Debtor and Southern Pointe Homes defaulted under the terms of their loan agreements with Vanderbilt.

### 3. Vanderbilt's Foreclosure Action, the Appointment of a Receiver, and Motion for Contempt by the Receiver

On February 18, 2026, Vanderbilt filed a foreclosure action in the United States District Court for the Western District of Louisiana (Lake Charles Division), naming, among others, the Debtor and Southern Pointe Homes as defendants. Vanderbilt sought collection of both its loan to the Debtor and its loan to Southern Pointe Homes. As of January 31, 2026, the Debtor owed Vanderbilt a principal balance of $8,614,902.69, and Southern Pointe Homes owed Vanderbilt $902,748.22.

Vanderbilt also filed an *ex parte* motion for the appointment of a receiver, as authorized under the loan agreements between the parties, and on February 19, 2026, the District Court entered an Order appointing M. Shapiro Management Company, LLC ("Shapiro") as the receiver (the "Receivership Order").

The Receivership Order authorized Shapiro to immediately "take possession of and administer all of the Mortgagors' rights with respect to the Property."[2] The Order

---

[2] Witness List, Exhibit List (Re: ECF # 16 Motion for Turnover, ECF # 19, Miscellaneous Motion, ECF 20 Motion to Prohibit Cash Collateral, Motion for Adequate Protection and/or Conditional Use of Collateral), Exhibit D-10 Receiver Order, (07/07/2026), ECF # 42-10 at ¶ (a).

4

defined "Mortgagors" as the Debtor and Southern Pointe Homes, and the Property is described in Exhibit A to the Order and is limited to the legal description of the land comprising the Community, which is owned by the Debtor. The term "Property" is further defined in the Order to include "the improvements" on the land, "all income from such immovable property," and "all movable property, both tangible and intangible, of Mortgagors, and all other assets of Mortgagors."[3]

The Receivership Order essentially gives Shapiro complete control over the Debtor's and Southern Pointe Homes' property and business to the exclusion of the Debtor and Southern Pointe Homes. And the Debtor and Southern Pointe Homes were required to immediately deliver to Shapiro all records, cash, agreements, and an accounting and reconciliation of all amounts received and held by the Mortgagors related to the Property. The Debtor and Southern Pointe Homes were also enjoined from disturbing Shapiro's possession and control of the Property and restrained from collecting any monies that may be payable to Debtor or Southern Pointe Homes. In addition to the above provisions, Shapiro was authorized, but not obligated, to maintain current insurance or obtain other insurance covering the Property. It also appears that Shapiro is not under any obligation or duty to provide an accounting or reconciliation for the funds it received under the authority of the Receivership Order, or otherwise answerable to the Debtor and Southern Pointe Homes for its actions; Shapiro appears to be only answerable to Vanderbilt.[4]

Although the relationship between the Receiver and the Debtor appears to have been cordial initially, numerous disputes soon developed between the Receiver on the one hand and the Debtor, Southern Pointe Homes, and Southern Choice Properties, on the other. Thus, on May 15, 2026, the Receiver filed a Motion for Contempt in the District Court action, and the Debtor and Southern Pointe Homes responded to that Motion on or about June 1, 2026. The hearing on the matter was scheduled for June 23, 2026, before the District Court.

---

[3] *Id.*

[4] *Id.* Specifically, see paragraphs (b) through (f) of the Receivership Order.

### 4. Southern Pointe Land Files Chapter 11 bankruptcy

On June 18, 2026, the Debtor commenced this chapter 11 proceeding, which caused the hearing on the Motion for Contempt in the District Court to be stayed. The Debtor then moved for turnover of its property from the Receiver (ECF # 16). In response, Vanderbilt filed a separate motion seeking an order excusing it from complying with § 543 of the Bankruptcy Code and seeking to maintain possession of the Debtor's property with the Receiver (ECF #19). The hearing on these matters took place on July 8, 2026.

The evidence presented by the parties during the evidentiary hearing is essentially the same as the evidence they planned to present to the District Court on the contempt motion. Indeed, the record of this matter includes the declaration of Austin Shapiro, the Receiver's representative, which was filed in support of the Receiver's Motion for Contempt, and Mr. Shapiro also testified at the July 8 hearing. He confirmed statements from his declaration:

- On February 20, 2026, I emailed a copy of the Receivership Order to William Rodwell.
- On February 20, 2026, William Rodwell responded to my email and copied his counsel, Wade Kelly.
- On February 21, 2026, I emailed copies of letters notifying William Rodwell of M. Shapiro Management Company, LLC's appointment as Receiver for Southern Point and The Haven (collectively, the "Receivership Notice Letters").
- On March 26, 2026, I emailed information on bank accounts I had set up for Southern Pointe and The Haven to William Rodwell and Marsha Hughey, who identifies herself to me as the Chief Accountant for Southern Choice, and requested remittance of collected funds net of approved expenses.
- On March 30, 2026, I emailed Marsha Hughey and William Rodwell regarding insurance premium payments and repeated my request for detail and a timeline for transfer of funds as soon as possible.
- On March 30, 2026, I emailed William Rodwell and repeated my prior requests for reconciliation of payments received and approved expenses paid and transfer of net funds.
- On April 1, 2026, I emailed William Rodwell with a copy to my counsel and repeated my prior requests for transfer of net funds by the end of the day.

- On April 7, 2026, I emailed William Rodwell and repeated my prior requests for a reconciliation of funds collected since entry of the Receiver Order, noting that it is imperative that funds collected be transmitted to me immediately. I also retransmitted information on the Receiver Accounts.
- On April 8, 2026, I emailed William Rodwell and made another request for reconciliation of funds collected since February 19, 2026.
- On April 10, 2026, William Rodwell emailed me with a copy to Marsha Hughey stating, "In response to your inquiry to me regarding collected funds, we will forward the total amount today."
- On April 21, 2026, Marsha Hughey provided me with income statements for February and March 2026. Those statements did not include any detail of cash on hand or reconciliation of receipts and expenses. Furthermore, no cash was transferred from the Mortgagors into the Receiver Accounts.
- On April 22, 2026, I retransmitted information on the Receiver Accounts to Marsha Hughey, William Rodwell and Robin Rials, who identified herself to me as the Operations Superintendent for Southern Choice, with a request that the funds shown on the income statements received be forwarded to me. I further requested their assistance in depositing rental payments I have directly received from tenants to date which are improperly made payable to Southern Choice Properties.
- To date, I have not received a proper reconciliation of funds collected and expenses paid by or for Southern Pointe or Southern Choice since entry of the Receivership Order in response to any of the emails I cite above.
- To date, I have not received any funds collected by or for Southern Pointe or Southern Choice Properties since entry of the Receivership Order.
- To date, I have not received any assistance in depositing tenant rental payments improperly made payable to Southern Pointe or Southern Choice since entry of the Receivership Order.

*See* Declaration of Austin Shapiro in Support of Motion for Contempt and Sanctions to Enforce Receivership Order, Exhibit VMF 35 (ECF #46-3).

In addition to the foregoing, Mr. Shapiro testified that he asked Vanderbilt to acquire force-placed insurance when the Debtor refused to pay the insurance premiums. On cross-examination he admitted that he did not send letters to the tenants notifying them to pay the Receiver until early April 2026, nearly six weeks

7

after the Receivership Order was entered, and the payment notice made a complete change in how rent was to be paid by requiring payment through an online portal. He also acknowledged delays in setting up the bank accounts but blamed the Debtor for this delay. He also admits that some of the tenants have made payment to the Receiver, but he contends that many have continued to pay Southern Choice Properties, which has thus far refused to turn those proceeds over to Shapiro or otherwise account for those proceeds. He stated that he was particularly concerned that the Debtor was allowing rent proceeds subject to Vanderbilt's security interest to be diverted to Southern Choice Properties and commingled by Southern Choice with proceeds from other properties that Southern Choice Properties manages.

The remaining witnesses testifying during the hearing all have ties to the Debtor. The witnesses were: William Rodwell, the Debtor's representative; Robin Rials, an Operations Manager for Southern Choice Properties; Kiera Bellard, an on-site manager employed by Southern Choice Properties and resident of the Community; and Ramzey Neas, a former resident of the Community. The Court will summarize their testimony.

Mr. Rodwell was initially called under cross by Vanderbilt. The record also includes the declaration submitted by Mr. Rodwell in opposition to the Receiver's Motion for Contempt, and Mr. Rodwell's testimony generally confirming statements from his declaration:

- Because Vanderbilt and/or Clayton were unable to provide more than 24 homes, legal entities other than Southern Pointe Homes and Southern Pointe Land purchased mobile homes for the community from different manufacturers.
- When Vanderbilt filed suit, it should have known that it did not have a security interest in all manufactured homes in the mobile home community. Vanderbilt did not represent to the Court that it did.
- In February 2026, I received notice that Vanderbilt had filed suit and that the district Court had issued an *ex parte* order at the request of Vanderbilt appointing a receiver, M. Shapiro Management Company, LLC, to operate the mobile home community.

8

- Upon having contact with Austin Shapiro of Shapiro Management Company, LLC, I told him that Vanderbilt only had a security interest in 24 homes in the manufactured home community.
- Mr. Shapiro disagreed with me regarding the extent of Vanderbilt's security interest but gave no valid reason for seeking to assert control over homes that are not subject to Vanderbilt's security interest.
- Mr. Shapiro proceeded to inform tenants of the mobile home community to pay both lot rent and home rent to his company.
- Although his company was appointed receiver during February 2026, Mr. Shapiro did not inform tenants of his role until April 2026. Someone associated with Shapiro posted on the doors of the mobile homes a letter dated April 2, 2026, with a copy of the receiver order and instructions regarding payment. In the letter, Shapiro representative, Brad Morris, referenced the need to establish and train office staff. He also informed the tenants that a web portal had been established. He instructed the tenants to make lot rent payments to Southern Pointe Land, LLC and home payments to Southern Pointe Homes, LLC. He did not distinguish between the homes on which Vanderbilt holds a security interest and those on which it does not hold a security interest.
- I have two assistants who assist me at the mobile home community. We have repeatedly asked Mr. Shapiro to true up the collections with us, but he refuses to do so.
- Shapiro, despite being appointed receiver, has failed to pay utilities. Southern Pointe has been required to pay utilities at the mobile home community. Through April 2026, Southern Pointe paid $35,272.52 in utilities expense.
- Shapiro has refused to pay for maintenance at the mobile home community, resulting in Southern Pointe's paying for it.
- Despite demanding assistance and labor from Southern Pointe staff and criticizing it as being inadequate, Shapiro refused to pay labor expenses during the month of February, resulting in Southern Pointe paying $17,660.88 in payroll expenses for the period February 19, 2026, through February 28, 2026.
- I have respected the receivership order and communicated with Mr. Shapiro, but he has refused to do likewise.
- I have not done anything contrary to the receivership order.
- I do not know whether Southern Pointe owes money to Shapiro or whether Shapiro owes money to entities that I manage for collecting excess home rent. Shapiro refuses to account for the

9

- money that it collected. I estimate that Shapiro has improperly collected approximately $45,000 in home rent that it should remit to Southern Pointe.
- Some of the tenants made copies of money orders that it delivered to Shapiro and gave Southern Pointe copies of the money orders.
- If Shapiro will account for the home rent it has collected it will be a simple bookkeeping exercise to determine whether anything is owed to Shapiro as receiver or whether Shapiro owes money for the home rent it collected.
- Because Shapiro refuses to provide an accounting so that the records can be reconciled and payments made as appropriate, I request that the Court instruct Shapiro to provide an accounting of all mobile home rents that it has received.

*See* Declaration of William Rodwell, attached to the Opposition to the Motion for Contempt, Exhibit Debtor 14 (ECF #42-14).

During the hearing, Mr. Rodwell admitted that the Debtor had not submitted certain payments to the Receiver. He contends that the Receiver has demanded and received payments from many of the tenants who are residing in Legacy Homes, and that those funds are not subject to Vanderbilt's security interest and thus should be returned to the Southern Choice Properties. Although not entirely clear, Mr. Rodwell seems to believe that the Receiver is improperly holding funds that exceed the amount that the Debtor may owe to the Receiver. Thus, until the Receiver agrees to work together to reconcile and true up these amounts, he is unwilling to turn over any more of the funds to the Receiver. Mr. Rodwell was also confronted with an Order from the Louisiana Department of Environmental Quality that appears to levy a monetary sanction against the Debtor related to the sewage plant located in the Community. Mr. Rodwell acknowledged the dispute but stated he was contesting the order. The Court observes that the order appears to be final.

Robin Rials, an Operations Manager with Southern Choice Properties, also testified. She stated that she had provided all information requested by the Receiver, including rent rolls, lease agreements, etc. She refuted the Receiver's description of the efforts made by the Debtor to assist the Receiver. She stated that the Debtor had provided the Receiver with an office and generally provided all documentation

10

requested in a timely manner. She stated that since the Receiver had taken over, move-outs exceeded move-ins by at least five, which was not typical. She also indicated that many tenants were confused by the changes the Receiver made in how rent was to be paid, particularly the requirement that the rents be paid through an online portal. Finally, she indicated that there had been many complaints regarding the overall maintenance of the Community after the Receiver came in.

Kiera Bellard, a four-year resident and property manager for the Community for the past two years also testified that move-outs had increased. She stated that the residents were confused by the Receiver's procedures and unhappy with the condition of the Community.

During the hearing, the Debtor also presented evidence showing that the property was not being properly maintained by the Receiver. This evidence included a video taken on June 9, 2026, by a former resident, Ramzey Neas. This video showed trash bins that were not being regularly emptied causing garbage, including soiled diapers, food waste, and other unsanitary items to proliferate through the community. The video also showed that the grass in the common areas was nearly waist high. Mr. Neas testified during the hearing that he moved out of the Community because he was concerned that his young child would come into contact with the garbage, and because the property was no longer being maintained. He stated that when he moved into the Community, in March 2026, the community was in good condition and that was one of the motivating factors for moving there. He stated that the Debtor allowed him to cancel his lease without penalty when he became concerned with the condition of the property and the harm it may cause his child.

The Debtor also presented pictures that were taken just prior to the hearing that also showed that the property was not being properly maintained by the Receiver.

Finally, the record also includes a video provided by Mr. Shapiro that shows that sometime after Mr. Neas recorded his video, the Receiver caused the trash bin area to be cleaned and power washed.

11

<u>**Discussion**</u>

Under § 543 of the Bankruptcy Code, a custodian who has knowledge of the commencement of a bankruptcy case is barred from taking any further action in the administration of the debtor's property and must deliver to the debtor any assets of the estate in his possession at the time he learns that a bankruptcy case was filed. *See* 11 U.S.C. §§ 543(a), (b); *see also In re Lizeric Realty Corp.*, 188 B.R. 499, 506 (Bankr. S.D.N.Y. 1995), *as amended* (Nov. 28, 1995). However, § 543(d)(1) excepts a custodian from the turnover requirements of § 543(b) if the interests of creditors and equity security holders, if the debtor is solvent, would be better served by permitting the custodian to continue in possession, custody, or control of such property. *See* 11 U.S.C. § 543(d)(1). A receiver is a "custodian" within the meaning of § 101(11) of the Code. *In re Lizeric Realty Corp.*, 188 B.R. at 506.

Vanderbilt bears the burden of establishing cause under § 543(d) to excuse the receiver from the turnover provisions of § 543(b). *Id.* Cause must be established by a preponderance of the evidence. *Id.* (citing *In re S.E. Hornsby & Sons Sand & Gravel Co., Inc.,* 57 B.R. 909, 913 (Bankr. M.D. La. 1986) (preponderance of the evidence standard applied in turnover proceeding under § 543) and *Grogan v. Garner,* 498 U.S. 279, 286, 111 S. Ct. 654, 659, 112 L.Ed.2d 755 (1991) (noting that the preponderance of evidence standard applies in most civil actions between private litigants)). "The ultimate determination of whether turnover is in the best interests of creditors is case specific and the relevant factors may be determined based on the facts of the case." 5 COLLIER ON BANKRUPTCY ¶ 543.05 (16th ed.). "In determining whether to excuse compliance with section 543 turnover requirements, the bankruptcy court has significant latitude to exercise its discretion." *Id.* Courts generally consider the following factors in determining whether compliance with § 543 should be excused:

1. whether there will be sufficient income to fund a successful reorganization;
2. whether the debtor will use the property for the benefit of its creditors;
3. whether there has been mismanagement by the debtor; and

4.      whether there are preferences which a receiver is not empowered to avoid.

*In re Lizeric Realty Corp.*, 188 B.R. at 506-07.[5] The parties' briefing primarily focuses on the first three factors from *Lizeric*, and the Court will do likewise. The parties did not present any evidence concerning the fourth factor. Accordingly, the Court will not consider that factor.

## 1. Whether There Will Be Sufficient Income to Fund a Successful Reorganization

Vanderbilt did not present any evidence concerning the Debtor's income and whether it is sufficient to fund a reorganization. Rather, Vanderbilt claims that the Debtor has no viable prospects for reorganization, relying on the factors set forth by the court in *Matter of Little Creek Development Co.,* 779 F.2d 1068 (5th Cir. 1986). *Little Creek* describes certain factors that often exist when a case has not been filed in good faith:

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. . . Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments. . . Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. . . Bankruptcy offers the only possibility of forestalling loss of the property. . . The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases.

---

[5] The Court notes that another test is often employed which only considers three factors. *See In re Powers Aero Marine Servs. Inc.*, 42 B.R. 540, 544 (Bankr. S.D. Tex. 1984). However, both tests cover the same substantive analysis. The parties briefed the *Lizeric* factors for this court, and thus it chooses to consider those in this matter.

*Matter of Little Creek Dev. Co.*, 779 F.2d at 1072–73.

Vanderbilt asserts that "every element" of the *Little Creek* factors are satisfied here: (i) the Debtor is a single asset entity; (ii) this asset is encumbered with Vanderbilt's lien; (iii) there are few unsecured creditors, and Vanderbilt asserts there will be no funds available to pay such creditors; and (iv) the Debtor merely filed this action to prevent contempt sanctions in the District Court for violation of the Receivership Order. Vanderbilt concludes its argument by claiming "there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'" Vanderbilt's Motion to Excuse Receiver from Compliance with Section 543 and to Authorize the Receiver to Remain in Possession, (06/24/2026), ECF # 19 at p. 13, ¶ 42 (quoting *Matter of Little Creek Dev. Co.*, 779 F. 2d at 1073).

The Court disagrees. While the Debtor appears to be a single asset entity, with no direct employees, the similarities to *Little Creek* end there. Unlike *Little Creek*, the Debtor here has ongoing concern with active leases of its lots, and the prospect of obtaining additional tenants. There appear to be a sizeable number of lots currently rented, although the record does not show precisely how many. Nonetheless, the Debtor is collecting $450 in rent on each of these lots, and it is also charging tenants fees for maintenance of the Community. These factors show that the Debtor may have the ability to generate sufficient income to fund a reorganization.

Additionally, there is no evidence of a "new debtor syndrome" or a showing that the Debtor was "created or revitalized" on the eve of Vanderbilt's foreclosure proceeding to isolate the Debtor's property. To the contrary, since 2018 the property has been in the name of the Debtor, and the Debtor is the owner and lessor of each lot in the Community.

Simply put, the record of this case does not support a finding of bad faith under the *Little Creek* factors. While speculative at this point, it also cannot currently be said that the Debtor will not have sufficient income to fund a reorganization. Finally, Vanderbilt has not presented any evidence indicating that the Debtor will be unable

14

to confirm a plan of reorganization in this case. Accordingly, Vanderbilt has failed to carry its burden on this factor.

### 2. Whether the Debtor Will Use the Property for the Benefit of Its Creditors

Courts generally have wide latitude in determining whether a debtor will manage its property for the benefit of its creditors. As one court has observed:

> [A] mere showing that the creditors will feel more comfortable with certain assets (such as cash or its equivalent) controlled by a third party rather than the debtor is not sufficient. Creditors are usually not comfortable with the debtor in charge of any assets. In the mindset of each creditor, there is little question but that each debtor in bankruptcy suffers manifest defects in character, or they would not be in bankruptcy.

*In re KCC-Fund V, Ltd.*, 96 B.R. 237, 240 (Bankr. W.D. Mo. 1989). "Similarly, the bankruptcy court may not find mismanagement by the debtor sufficient to warrant noncompliance by the custodian with turnover requirements, where the debtor's prepetition actions are within the range of reasonable business judgment and 'not patently unreasonable.'" 5 COLLIER ON BANKRUPTCY ¶ 543.05, (quoting *In re Donato*, 170 B.R. 247, 257 (Bankr. D.N.J. 1994)). On the other hand, courts will often maintain a receiver in possession where it is shown the debtor has grossly mismanaged the property, or simply is incapable of managing the property. This is especially so where the evidence shows the receiver "has been proceeding expeditiously and professionally to manage the affairs of the debtor." *In re Uno Broad. Corp.,* 167 B.R. 189, 200 (Bankr. D. Ariz. 1994) (assets of debtor should remain in hands of receiver when receiver has been proceeding with haste to manage the affairs of the debtor and has experience in the debtor's industry, and where the debtor's sole shareholder is in jail and unable to manage the business, and debtor's wife, to whom he assigned a power of attorney, has no business experience).

Turning to this case, Vanderbilt provides three grounds for this Court to find that the Debtor will not manage the property for the benefit of its creditors (i) the Debtor's defiance of the Receivership Order by refusing to turn over all rents it

15

received after the Receivership became effective; (ii) the Debtors improper diverting of its rental income to Southern Choice Properties where they are commingled with revenues from other properties; and (iii) the similarities between this case and another case pending in this Court, *Gulf Stream Manor MHC, LLC*, Case No. 25-20473, filed 09/25/2025.[6] The Court will consider each of these grounds.

The evidence before the Court supports Vanderbilt's assertion that the Debtor has failed to turnover lot rents it received after the Receivership Order became effective, as the Debtor admits this fact. It also appears that the Debtor has been less than helpful in endorsing the checks and money orders received by the Receiver but made payable to Southern Choice Properties.

But the record also shows that there are legitimate legal disputes between the parties regarding the breadth and meaning of the Receivership Order. As pointed out by the Debtor, there are several streams of income emanating from the operations of the Community: rent from the Debtor's leasing of home lots, rent from Southern Pointe Homes' leasing of the Clayton Homes, and rent from other third parties' leasing of the Legacy Homes. Since Vanderbilt's security interests only encumber the home lots owned by the Debtor and the Clayton Homes owned by Southern Pointe Homes, it seems that the Receiver's interest in the rent revenues should be similarly limited.[7] Yet, the Receiver has taken the position, based on its interpretation of the Receivership Order, that it is entitled to all the rents derived from operating the Community and has thus refused to provide an accounting for the rents it may have received pertaining to the Legacy Homes.

The Court certainly does not condone the Debtor's failure to turn over all lot rents it may have received after the Receivership was ordered and finds that a better course of action would have been for the Debtor to have petitioned the Court for

---

[6] Gulf Stream is linked to the Debtor through common ownership and is also managed by Southern Choice Properties

[7] At the conclusion of the hearing on these matters, Vanderbilt's counsel admitted that Vanderbilt's security interest only encumbers the Clayton Homes, and that if the court finds that the Receiver should return the property to the Debtor, that the Receivership would remain as to the 24 Clayton Homes only (because Southern Pointe Homes, the owner of the Clayton Homes, is not a Debtor).

16

clarification of the Receivership Order. Nonetheless the Court finds that the Debtor's actions emanate more from a misunderstanding between the parties as to the breadth of the Receivership Order rather than a blatant disregard for that Order. Indeed, there is ample evidence in the record showing that the Debtor offered its full cooperation in implementing the Receivership Order. It met with the Receiver by Zoom and once in person in early March to discuss the orderly turnover of the properties to the Receiver. It provided the Receiver with an office. It also provided rent rolls, lease agreements, accounting records and income and expense reports to the Receiver.

Moreover, the Court finds that some of the problems encountered by the Receiver are of its own making. For example, the Receiver's delay in providing written notice to the tenants that payment should be made to the Receiver caused considerable confusion. The record shows that this notice was not given until early April, nearly six weeks after the Receivership Order, and after all the March rents would have come due. Additionally, the Receiver implemented a complete wholesale change to the procedure tenants were accustomed to following to pay rent, by requiring that all payments be made through an online portal rather than in person, as had been done in the past.[8] Finally, the evidence shows that the Receiver has not moved with haste to employ an onsite manager, and if it had done so, perhaps some of these issues could have been averted.

After giving due consideration to the evidence presented by the parties, the Court does not find that the Debtor acted unreasonably under the circumstances surrounding the implementation of the Receivership Order.

Nor does the Court find that the channeling of the Debtor's rent revenues to the manager of the Community, Southern Choice Properties, is unreasonable. As pointed out by the Debtor, the collection of the Debtor's rents by Southern Choice

---

[8] It is also unclear to the Court whether the Receiver attempted to explain to the renters of Legacy Homes that they should continue to pay the rent on those homes to Southern Choice Properties since Vanderbilt did not have a security interest in those homes. It appears that the Receiver took the position that it was entitled to all rents from tenants, and all maintenance fees, without considering the interests of parties not subject to Vanderbilt's security interests.

17

Properties is not, in and of itself, evidence of impropriety, as it is common for a management company to oversee the interests of multiple entities related to mobile home developments. Indeed, the Loan Agreement between the Debtor and Vanderbilt contemplates Southern Choice Properties' involvement in the Debtor's business. The Loan Agreement includes the following:

> **"Assignment of Management Agreement"** means that certain Assignment of Management Agreement executed by Southern Choice Properties, LLC, a Mississippi limited liability company, in favor of Lender of even date herewith, as the same may be amended, modified or supplemented from time to time.

Exhibit(s) (Re: 41 Witness List, Exhibit List), Exhibit 4 – SP Loan Agreement, (07/07/2026), ECF 43-3 at *1.

Additionally, the term "Loan Documents" is defined in the Loan Agreement to include, among other documents, the Assignment of Management Agreement. Thus, while the Receiver's representative testified that he was surprised to find that the Debtor's rents were collected by Southern Choice Properties, Vanderbilt should not have been, given its knowledge of the Management Agreement. While the Management Agreement is not in the record, the mere fact that it is mentioned in the Loan Agreement signifies to the Court that all parties were aware that Southern Choice Properties had a role in the development and operations of the Community.

Moreover, Vanderbilt did not present any direct evidence showing that the Debtor's property is being unreasonably managed. Rather, Vanderbilt directs the Court's attention to another case pending in this Court, *Gulf Stream Manor MHC, LLC,* Case No. 25-20473, filed September 24, 2025, to support its argument that the Debtor will not operate the Community for the benefit of creditors.

It is undisputed that Gulf Stream is related to the Debtor in this case through common ownership. It is also undisputed that Southern Choice Properties also provides management services to Gulf Stream. According to Vanderbilt, Gulf Stream diverted funds to Southern Choice Properties and failed to account to the Debtor for those funds, which purportedly damaged Gulf Stream's secured creditor, Wells Fargo.

Thus, Vanderbilt asserts that the Receiver should be kept in place to prevent similar circumstances from occurring in this case.

Mr. Rodwell, the principal owner of both the Debtor and Gulf Stream, testified that the issues in the Gulf Stream bankruptcy case were resolved by requiring Southern Choice Properties to transfer all monthly revenues collected on behalf of Gulf Stream back to Gulf Stream, along with an accounting for those revenues. Also, Southern Choice Properties is prohibited by court order from charging management fees for its services without approval from the court. Mr. Rodwell indicated his agreement with a similar arrangement in this case. Thus, while there were issues in Gulf Stream related to Southern Choice Properties' management, as raised by Gulf Stream's primary secured creditor and the United States Trustee in that case, the issues were resolved, and Gulf Stream remains in possession of its property. For these reasons, the Court does not find the Gulf Stream case to be dispositive of the issues presented by Vanderbilt's motion in this case.

Accordingly, the Court finds that Vanderbilt has not carried its burden of showing the Debtor will not manage its property for the benefit of its creditors.

### 3. Whether There Has Been Mismanagement by the Debtor

Courts have refused to divest a receiver of possession if it is shown that the Debtor has mismanaged the property through self-dealing and other misrepresentations approaching fraud. *See In re Foundry of Barrington P'ship*, 129 B.R. 550 (Bankr. N.D. Ill. 1991); *In re Dill,* 163 B.R. 221 (E.D.N.Y. 1994). Additionally, turnover by a receiver may be excused where "maintenance of the [property has] been sadly neglected." *In re KCC Fund V,* 96 B.R. at 240.

Vanderbilt claims the following factors show that the Debtor has mismanaged its property: the debtor's default on the Vanderbilt loan, the Debtor's willful violation of the Receivership Order, the diversion of the Debtors' rent revenues to Southern Choice Properties, and alleged mismanagement by Gulf Stream. The Court has already considered most of these arguments above, and for the reasons previously stated, the court does not find that they support maintaining the Receiver in

19

possession of the Debtor's property. Moreover, the Debtor's default on Vanderbilt's loan certainly should not provide the basis for a finding of mismanagement. "If every debtor in default was deemed to have mismanaged its business for purposes of § 543(d)(1), it would be virtually impossible for any debtor to regain control of its property and to enjoy the presumption that chapter 11 debtors should operate as debtors in possession." *In re R & G Props., Inc.*, No. 08-10876, 2008 WL 4966774 at *10 (Bankr. D. Vt. Nov. 21, 2008).

The Court also notes that the condition of the Debtor's properties has suffered a significant decline over the four months that the Receiver has been in control, as depicted in the video and photographic evidence contained in the record. Most concerning is the existence of overflowing trash bins, with soiled diapers and food residue being windblown through the Community with the potential to harm the residents. Indeed, Mr. Neas' video and testimony is particularly compelling, as he stated that when he moved into the Community in early March 2026, the premises were generally well maintained, but he was compelled to move out in June due to unsanitary conditions that existed in the Community at that time.

The Receiver's representative acknowledged many of these problems and presented a video that showed that the trash problems had been addressed in the past couple of weeks. Nonetheless, the Receiver is generally aware that it needs to have on-the-ground management, to both collect rents and ensure that the premises are maintained, but until now it has not moved expeditiously to provide this management.

Simply put, the record of this matter does not support Vanderbilt's assertion that the Debtor was mismanaging the properties prepetition.

<u>Conclusion</u>

It bears repeating that this Court does not condone the Debtor's admitted noncompliance with the Receivership Order issued by the District Court. But the issue before this Court is not whether the Debtor should be sanctioned for violating the Receivership Order. Rather, this Court is charged with determining whether the Receiver should be excused from complying with the mandate in § 543 of the Code, to

20

return the Debtor's property back to the Debtor. While the Debtor's conduct under the Receivership Order is obviously relevant, it is not the sole determining factor. The Court is required to consider all the factors, so that it can make an on-the-spot determination, just weeks into the case, whether possession should be returned to the Debtor.

After weighing all the factors here, the Court finds that Vanderbilt has not carried its burden, and thus it will order the Receiver to return the property to the Debtor. While the Receiver has good intentions, its management of the properties from afar (the Receiver is in Michigan) is not in the Creditors' best interest. While under the Receiver's care, the property has suffered a major deterioration. Most of this stems from the Receiver's delay in placing a property manager and maintenance personnel on the ground in the Community. Moreover, the wholesale changes in how tenants are to make rent payments (especially with respect to the Legacy Homes) are causing more confusion and disruption than seems necessary. This is causing the Community to lose residents, which in turn, may cause a diminution in the value of the Debtor's property. Based on the record in these matters, it is the Court's view that the Debtor is in the best position to maintain the status quo and hopefully grow the Community, which is in the creditors' best interest.

In conclusion, the Court cautions the Debtor that it is required to comply with all reporting and accounting requirements with respect to the Debtor's revenues required by the Bankruptcy Code and rules. The Court trusts that the principals of the Debtor have learned what is required from their involvement in the Gulf Stream case, and that the problems encountered there will not be repeated. Additionally, as the Receiver will remain in place with respect to the Clayton Homes, the Debtor should immediately turn over any rent revenues it may be holding attributable to Vanderbilt's security interest in the Clayton Homes.